# Case No. 5,653.

## The GRACE LOTHROP.

[Holmes, 342; 1 Cent. Law J. 189; 8 Am. Law Rev. 620.][1]

Circuit Court, D. Massachusetts. March, 1874.[2]

AGREEMENTS OF SEAMEN — SHIPPING COMMISSIONER — ACT OF JUNE 7, 1872.

1. Section 13 of the act of June 7, 1872 (17 Stat. 262), requiring agreements of seamen

---

[2] Taken by writ of error to the U. S. supreme court, and overruled. Aldrich v. Aetna Co., 8 Wall. [75 U. S.] 491.

[3] 9 Stat. 440.

[1] [Reported by Jabez S. Holmes, Esq., and here reprinted by permission. 8 Am. Law Rev. 620, contains only a partial report.]

[2] [Affirmed in 95 U. S. 527.]

to be signed in the presence of a shipping commissioner, refers only to the agreements mentioned in section 12 of that act.

[See note at end of case.]

2. The second clause of section 14, which provides for penalty for receiving to be entered on board a merchant-ship any seaman engaged or supplied contrary to the provisions of the act, does not refer to seamen who have agreed to make a voyage not mentioned in section 12, and have not signed the agreement in presence of a shipping commissioner.

[Cited in U. S. v. The Thomas W. Haven, 3 Fed. 349.]

3. Section 8 authorizes the master, owner, or consignee of a ship about to make a voyage not mentioned in section 12, to be his own shipping commissioner; and this provision is not affected by sections 13 or 14.

In admiralty.

E. L. Barney, for the United States.
S. J. Thomas, for the ship.

LOWELL, District Judge. This libel s brought by the district-attorney in behalf of the United States, to enforce a penalty not exceeding $1,000, for five seamen alleged to have been engaged or supplied contrary to the provisions of the act for the appointment of shipping commissioners, approved June 7, 1872 (17 Stat. 262), and to have been knowingly received on board by the master of said vessel, at Boston, on the eighteenth day of December last. The particular charge is, that the agreement with the men was not signed in the presence of a shipping commissioner, although there was such an officer at Boston, duly qualified and ready to act. The voyage was from Boston to one or more ports in the West Indies, and back to Boston. The answer admits the shipment of the men, but denies that the voyage was one within that part of the statute requiring agreements to be signed before a shipping commissioner. The first section of the shipping act which mentions agreements is section 12, which prescribes a particular form of agreement to be entered into by the master with his crew before he proceeds on any foreign voyage, or on one from the Atlantic to the Pacific coast, or vice versa. This section was amended in January, 1873 (17 Stat. 410), so as to remove from its scope voyages to the West India Islands or to Mexico. Section 13 of the principal act then goes on to require that all agreements shall be signed in the presence of a shipping commissioner. Section 14 makes the ship liable to penalties: First, if any person shall be carried to sea as one of the crew on board of any ship making a voyage as before specified "without entering into an agreement with the master in the form and manner and place and times hereby in such cases required;" and, secondly, if any master, mate, or other officer of any ship, knowingly receives to be entered on board of any merchant-ship, any seaman who has been engaged or supplied contrary to the provisions of the act. The argument for the United States is, that the language of section 13 is very broad, and is intended to include not only the agreements mentioned in the act itself, but all those which may be made under the act of 1790 [1 Stat. 131], which takes in all voyages of any importance, excepting in the fisheries; that the first penal clause of section 14 punishes a non-compliance with the act of 1872 by carrying seamen to sea who have not signed an agreement in all respects as required by section 12; and the second penal clause, punishing the taking on board seamen illegally engaged or supplied, must refer to something, and why not, then, to seamen who come within the act of 1790, and have signed an agreement as required by that act, but not before a shipping commissioner? I shall presently show that neither of these sections has the meaning contended for; but my decision is chiefly based upon section 8, which provides, in so many words, that nothing in the act contained shall be construed to prevent the owner, master, or consignee of any ship, except as described in section 12, from performing himself, so far as such ship is concerned, the duties of shipping commissioner under this act. This is a controlling section, which governs sections 13 and 14, and all others, and explicitly declares that nothing contained in them, or any of them, shall be construed to prevent the master, in such a case as this, from shipping his own crew. Granting, therefore, that the construction of sections 13 and 14, contended for by the prosecution, is sound, then all agreements not mentioned in section 12 must be signed in the presence either of the official commissioner or of the master, owner, or consignee; and the libel in this case does not allege any thing except the absence of the duly qualified official. It does not say that the master, owner, or consignee did not act as shipping commissioner, and act fully and with all due form in that capacity. This was the point relied on in argument; but there are others of considerable force. Recurring now to section 13, it is as follows: "The following rules shall be observed respecting agreements: First, every agreement (excepting in such cases of agreement as are hereinafter specially provided for) shall be signed by each seaman in the presence of a shipping commissioner;" secondly, they are to be signed in duplicate, one part of which shall be retained by the shipping commissioner, and the other shall contain a special form or place for the description and signatures of persons engaged subsequently to the first departure of the ship; thirdly, there is to be an acknowledgment and certificate under the hand and official seal of the commissioner, indorsed on the agreement, testifying to all the acknowledgments, and to the intelligent and sober appreciation by the men of the contract they have signed. And it is tolerably clear, I think, that all this apparatus was not intended to be brought into operation four times a week, for voy-

ages between this port and New York. This I say merely by way of illustration. It must apply to all coasting voyages, if it applies to any voyages not mentioned in section 12. I am not sure that I can express my opinion as clearly as I hold it; but it does seem to me that sections 12 and 13 are one enactment, concerning one and the same subject-matter, and no other; that the former requires agreements to be made in certain cases, and the latter provides how they shall be signed and acknowledged. It is said that the expression "every agreement" is broad enough to cover all those required in coasting voyages by the act of 1790. This is true. But it is much broader than that. It will cover every agreement made by a seaman for any voyage, or, indeed, for any thing else; there is nothing in section 13 to limit it to any subject-matter. It is, simply, every agreement shall be signed by the seamen in the presence of a shipping commissioner. It is confined to seamen signing agreements, and that is all. Of course it must be limited, and by the context; and the only context is section 12. The well-known statute of 20th July, 1790, § 1 (1 Stat. 131), requires the master of every ship or vessel bound on any sort of a voyage, coasting or other, with very trifling exceptions, before he proceeds on the voyage, to make an agreement in writing or print with every seaman, under a penalty of twenty dollars. This has been held not to include whaling and fishing voyages. The argument for the United States, as I have said, imports this statute into section 13 of the act of 1872, by the words "agreements" and "every agreement." Another objection to this construction is, that under it, if a master, about to proceed on a coasting, or Mexican, or West Indian voyage (which is admitted to come under the act of 1790, and not under section 12 of the act of 1872), makes no written agreement with any of his crew, he is liable to a penalty of twenty dollars for each seaman carried to sea, while if he makes one in strict and careful conformity with that statute, but not in presence of a shipping commissioner, the penalty is $200 for each seaman. For it has not been contended, and cannot be successfully maintained, that the act of 1872 punishes the neglect to make any written agreement at all, except as required by section 12. Nay, more, the act of 19th June, 1813 (3 Stat. 2), requires a written agreement for the cod fishery, and imposes no penalty for a breach; whaling voyages and those for mackerel are always made under written agreements, though no statute requires it. All these agreements are within section 13, if those under the statute of 1790 are included; for an agreement is an agreement. If this be the true construction of the act, it holds out a strong inducement against making written contracts in any of these cases, because the whole real and actual contest is a question of the fees of the shipping commissioner,

and the trouble and formality attending the shipments before such an officer. .It is said that it would operate beneficially if all agreements were signed before a commissioner. That may be so. As regards foreign voyages, I agree to it most heartily. But the protection which the commissioner would afford is of comparatively little importance in the coasting trade, in which the crew have frequent opportunities to obtain redress of any wrongs they may suffer; because they are never many days' sail from a home port, and in which they seldom suffer any wrongs. It is a fact well known to all judges in commercial ports, that there is very little complaint or litigation between officers and men growing out of the voyages not mentioned in section 12. Scarcely a term passes that I do not try several indictments for offences said to have been committed on foreign voyages; and I can recall but one criminal case that I ever tried in which the complaint related to a coasting voyage. [I doubt whether the supposed advantages of applying this section to coasting voyages would make up for the expense incurred by such a practice.][3] The same sort of protection which would be afforded by shipping seamen for the coasting trade in presence of a commissioner would be derived by discharging them before that officer; and the commissioner's services are more necessary at this time, because most of the disputes concern the perquisites and charges rather than the contract; but the necessity for this is expressly negatived by section 22. I shall speak in a moment of. the suggestion that there is no such express exception in section 13. To me it is plain that congress, as shown by sections 8, 12, 22, and many others, did not intend to hamper our enormous coastwise trade, with its constantly recurring voyages, by the burden of paying the fees of shipping commissioners; and I see good reason for the exception. And some one has prevailed on the legislature to class West Indian and Mexican voyages with the coasting trade in this respect. It is said that if it was intended to limit the broad and general language of section 13, it would have been easy to say so in the section itself. It appears to me that the limitation is plain enough. But, if not, the remark is quite as pertinent, and more so, that if congress intended to include in section 13 agreements which are not mentioned in the act, it was not only easy, but highly necessary, to point them out. I do not mean to be understood that section 13 is free of difficulty. The main question of its construction is now pending before the supreme court, on a certificate of division of opinion from this circuit and district, and with whatever decision is made I shall not only be bound to be, but shall be, entirely content.

The next point is whether the second clause

---

[3] [From 1 Cent. Law J. 189.]

of section 14 punishes the taking on board ship a seaman who has signed such an agreement as is required by the act of 1790, but has not signed it before a shipping commissioner. We here concede, of course, for the purposes of the argument, that section 13 requires such signing. I consider it tolerably certain that this part of section 14 has no such intent. The offence is receiving on board seamen who have been engaged or supplied contrary to the provisions of the act. Now there is nothing in the act, or in any other that I know of, which regulates the engaging or supplying of seamen before they are taken on board ship. The acts of 1790 and 1872 require certain agreements to be made before the voyage is begun; but it is entirely consistent with these laws, and is the practice in some trades, to make the agreements on board the ship, after the seamen have been orally engaged. How, then, can this offence be committed? I do not know. But I do see that there is nothing in the act of 1872 contrary to which seamen can be received on board a merchant-ship. This penal clause, excepting in the amount of penalty, and the person who is to pay it, is taken literally from the merchant shipping act of Great Britain of 1854, § 147, in which it has a totally different sense from that now proposed for it. That statute provides not only for shipping commissioners (called in that act "shipping masters"), before whom agreements are to be signed and men discharged, &c., but also that a certain number of persons may be licensed in a certain way to procure and supply seamen for merchant-ships, that is to say, to make the original and general oral engagement with them; and there is a penalty on any unlicensed person who shall procure or supply seamen; and a penalty on the master who receives on board persons so unlawfully engaged or supplied, which is the clause now under review. Its intent is plain and intelligible, and has nothing to do with the written agreement one way or another. Now I admit that our act does not provide for any such license, and therefore cannot have the meaning given it in England, and I admit we must try to give a meaning to every part of every act of congress; but I cannot admit that I ought to exercise a great deal of ingenuity to find a secondary or conjectural sense for a set of words which has been taken bodily from a place where its intent is obvious, and put into one where there is no apparent meaning for it. I know, in point of fact, that it must have been adopted for what it might turn out to be worth in its new quarters. I agree, further, that the word "engagement" might include a written agreement. But when the defined offence is the receiving on board a ship seamen not duly engaged or supplied, and there is no law regulating their supply, and no law which requires the written engagement, if we choose to call it so, to be made

before they are received on board; and when the natural and obvious and historical meaning of the word does not refer to any written agreement, and if it be construed to mean any written agreement, the offence must depend on whether the master chooses to make the written agreement on shore or on board, —I conclude that "seamen engaged or supplied" does not mean seamen who happen to have signed one sort of contract or another before the time when there is any necessity for them to sign any thing.

I have seen copies of the judgments of the district and circuit courts for the Eastern district of New York in the case of The City of Mexico [Case No. 2,756], which sustain the position of the prosecution. It is hardly necessary for me to say that these judgments have received my most careful and respectful consideration. Were it not for that decision I should not consider this case a very doubtful one. I venture to say, however, that, as far as may be gathered from the opinions of the judges, the case was very imperfectly presented by the defence, and what argument there was, took up the wholly untenable ground that the act of 1790, so far as Mexican voyages are concerned, had been repealed; and a great part of the opinions is taken up in a convincing refutation of that argument. No allusion is made to section 8, nor to any of the arguments which seem to me to have force in construing sections 13 and 14. It is impossible for me, therefore, to ascertain whether these arguments might not have had some weight, and even a controlling weight, in the case, if they had been presented or suggested. Sitting here under a responsibility which I cannot transfer except when a decision of binding authority upon this court has been made, my best judgment is: 1. It is doubtful whether section 13 refers to any agreements not mentioned in section 12. In my opinion it does not. 2. It is doubtful whether section 14, second penal clause, has any reference to the signing of written agreements. In my opinion it has not. 3. Section 8 expressly declares that on a voyage of the kind now in judgment the master may be his own shipping commissioner, and this libel does not negative the master of the Grace Lothrop having acted as such commissioner on this occasion. Libel dismissed.

[NOTE. Upon argument in the supreme court (95 U. S. 527), Clifford, J., was of the opinion that, under the Revised Statutes, vessels engaged in trade between the United States and the West Indies are not subject to the regulations enacted with respect to vessels engaged in foreign commerce not falling within the exceptions mentioned. The provision in the old acts, under which this suit was brought, requiring the agreements to be signed in the presence of a shipping commissioner, it was decided, referred only to the agreements described in section 12, and does not include the exceptions. The position of the circuit court upon all points was explicitly affirmed.]